MARION DALE FLEWALLEN *v.* STATE OF INDIANA.

[No. 976S304. Filed October 14, 1977.]

*Thomas Krochta, Rice & VanStone,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *Lesley A. Bowers,* Deputy Attorney General, for appellee.

PIVARNIK, J.—Appellant Flewallen was found guilty of the second degree murder of Erica Grigsby, the eighteen-month-old daughter of his wife, Virginia, by a former marriage. At the conclusion of a jury trial in Vanderburgh Circuit Court, appellant was sentenced on March 25, 1976, to life imprisonment.

The evidence was that appellant had beaten the child on occasions previous to her death, and that there were times when Virginia removed her from their apartment overnight for protection from these beatings. Several witnesses testified they saw a sign hanging on the baby's crib with the inscription "Erica is a Monster," and a picture there of a head in a hangman's noose. In the afternoon of August 30, 1974, Virginia went to the bedroom and left Erica in the presence of appellant in the living room. She heard an unusual noise and came running out to find Erica lying at the bottom of the stairs. Appellant was not present. Virginia ran out of the apartment carrying the child, calling for help. Shortly thereafter, appellant was seen outside the apartment by several neighbors. At trial, the physician who performed the autopsy on Erica stated that the cause of death was a puncture wound of the heart produced by a broken rib. In the doctor's opinion, this wound resulted from a forcible blow from a soft instrument, possibly a hand, and not from the child's falling down the stairs.

Five specifications of error are submitted to us for review in this appeal: (1) that appellant's motion for discharge should not have been overruled; (2) that the admission of prior statements of several prosecution witnesses, who were present in court and testifying, violated appellant's right of confrontation; (3) that it was error to allow the prosecutor to ask appellant's wife whether she ever had pleaded guilty to a charge of child cruelty; (4) that appellant's motion for

mistrial should have been granted, because of a hypothetical question put by the state to appellant's expert witness which referred to appellant's previous criminal conduct; (5) that questions to appellant's expert by the state improperly incorporated another's diagnosis of appellant's mental condition made at another time.

## I.

The indictment against appellant was filed on September 19, 1974, and he has been held in jail since that time. All parties agree that delay in coming to trial was occasioned by appellant's actions in moving for a change of venue, which was granted, and further moving for mental evaluation to determine competency to stand trial. During much of this time appellant was incarcerated in Norman Beatty Hospital, and was not returned to the Vanderburgh County Jail until March 4, 1975. On September 17, 1975, the court set this cause for trial by jury for December 1, 1975. Appellant objected to this setting, stating that it was six months after the March 4, 1975, date and that therefore he was subject to discharge under Ind. R. Crim. P. 4(A). Rule 4(A) provides that the defendant is entitled to release *on his own recognizance* after *six months* incarceration if the delay has not been occasioned by his own action. Ind. R. Crim. P. 4(C) provides that if the defendant is held for a total of *one year* with charges pending against him, and the delay not being occasioned by his own action, then he has a right to be *discharged*. The court properly overruled appellant's motion for discharge in this cause.

## II.

Over appellant's objection, the court allowed prior statements of witnesses for the state made to the police, the coroner, and the grand jury to be read to the jury. Although there were some minor conflicts, most of the statements were consistent with the statements given by the witnesses on the stand, though the previous statements were more detailed

in each case. Each witness confirmed that he or she had made the prior statement. Appellant claims that admission of these statements violated his Sixth Amendment right of confrontation.

This issue was decided by this court in *Patterson* v. *State*, (1976) 263 Ind. 55, 324 N.E.2d 482. The evidence in both *Patterson* and the present case was relevant as it was more detailed and thus more incriminating than the trial testimony of the witnesses. Here, as in *Patterson*, the witnesses were available for cross-examination and for the trier of fact to observe their demeanor and judge their credibility. Thus one of the primary reasons for the application of the old hearsay prohibition is missing: the insusceptibility of the evidence to cross-examination. The presence of the witness for cross-examination also disposes of any confrontation problem, pursuant to the rule of *California* v. *Green*, (1970) 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489. Since all of the witnesses whose prior statements in the form of voluntary statements to the coroner, the police, and grand jury were available at trial, and were in fact cross-examined by the defense, the statements were admissible and no reversible error occurred.

### III.

When Virginia Flewallen testified for the state, she was asked by the prosecutor if she had pleaded guilty to a charge of cruelty to a child in a case in the Vanderburgh Circuit Court. She answered in the affirmative. Appellant objected to this question and answer, and moved for a mistrial. He argues on appeal that this testimony was improper, irrelevant and prejudicial, since "a husband and wife are often traditionally viewed as a single unit." Thus, the argument goes, this question and answer were meant to portray appellant as a criminal type who was married to a woman who could be cruel to a child, and who therefore sanctioned such behavior on the part of his wife. The state argues that the evidence

could just as well be considered favorable to the defense, since it is an admission from the only other person in the apartment at the time of the child's death that she had been found guilty of child cruelty. We agree, and find that appellant has not met his burden of showing prejudice in this alleged error. *Hester* v. *State*, (1974) 262 Ind. 284, 291, 315 N.E.2d 351, 355.

## IV.

In propounding a hypothetical question to Doctor Pontaoe, a defense expert witness, the prosecution included in background facts that appellant had at one time burglarized his parents' home. Appellant objected to this inclusion on the grounds that it was irrelevant, prejudicial, and not within the evidence. The objection was sustained and the jury was admonished by the court to disregard it. In *Young* v. *State*, (1970) 254 Ind. 379, 386-87, 260 N.E.2d 572, 577, this court said:

> "Appellant was not harmed by the answer he objected to. He has overlooked the fact that he filed a plea of not guilty and a special plea of not guilty by reason of temporary insanity. Appellant was examined by psychiatrists who testified at the trial. On a plea of not guilty by reason of insanity appellant opened the door for the admission of testimony as to his entire life, certainly any criminal record he had and any admissions he may have made relative thereto."

Appellant in this cause also entered a plea of temporary insanity, and the evidence in question would fall under the same test as *Young* v. *State*, above.

Furthermore, an admonishment to the jury is presumed to cure any error. The granting of a mistrial is within the sound discretion of the trial court and clear error in the court's overruling of a motion for mistrial must be shown to mandate reversal of a conviction. *Dewey* v. *State*, (1976) 264 Ind. 403, 345 N.E.2d 842. The appellant has the burden of proving that alleged misconduct requires

either a mistrial or reversal on appeal. No such clear error appears here since the jury was admonished, creating a presumption of correction of error which has not been rebutted.

## V.

While the same expert witness was testifying on cross-examination, the prosecutor asked him if he had examined the report of one Doctor Tullen. The witness stated that he had, and was allowed by the court to give the entire report of Doctor Tullen from the witness stand. Doctor Tullen's report was not inconsistent with the witness Doctor Pontaoe's testimony. It was Doctor Pontaoe's opinion that appellant was temporarily insane at the time of the commission of the act in question, and he further had the opinion that Doctor Tullen's report would confirm this. Doctor Tullen's report contained observations of appellant in 1970, and a diagnosis of appellant as a "sociopathic" personality.

While an expert opinion as to the defendant's mental condition by a person not available for cross-examination is not admissible testimony, such report may be used as a basis of a testifying expert's opinion as to the defendant's sanity if it is in a form that he would normally use in making his professional evaluation. *Smith* v. *State*, (1972) 259 Ind. 187, 285 N.E.2d 275, *cert. denied* 409 U.S. 1129, 93 S.Ct. 951, 35 L.Ed.2d 261 (1973). It was improper for the court to permit Doctor Pontaoe to read the entire report including Doctor Tullen's diagnosis. However, we fail to see how doing so in this case in any way prejudiced the appellant. Appellant was urging the defense of temporary insanity, and had presented Doctor Pontaoe to prove that such a condition existed. Doctor Pontaoe testified that after studying the report in question, he believed it compatible and even supportive of his stated opinion that the defendant was, in fact, temporarily insane at the time of the death of this child. Therefore, any error in permitting the reading of the report was harmless.

Since we find no reversible error in these specifications, the judgment of the trial court is affirmed.

Givan, C.J., Hunter, Prentice, JJ., concur; DeBruler, J., dissents with opinion.

## DISSENTING OPINION

DeBruler, J.—This case involves the wholesale use of prior testimony and out-of-court statements of less than enthusiastic prosecution witnesses during their direct examination. Five statements given by witnesses to the police, one statement to the coroner, and six sets of grand jury testimony were read, virtually in their entirety, to the jury during the examination of six witnesses. The extrajudicial statements of two of the witnesses were introduced and read only after those witnesses had been questioned as to the events involved and had professed difficulty in remembering those events. *The remaining four witnesses were simply called to the stand for the purpose of authenticating their respective statements and testimony, which were read to the jury before these witnesses were asked any questions about the events surrounding the death of Erica Grigsby.*

The majority sanctions this indiscriminate use of extrajudicial statements by relying on this Court's holding in *Patterson* v. *State,* (1975) 263 Ind. 55, 324 N.E.2d 482, that out-of-court statements are not inadmissible as hearsay when the declarant is available at trial for cross-examination. *Patterson* did not consider a criminal defendant's Sixth Amendment right to be confronted with the witnesses against him. The majority "disposes of any confrontation problem" by relying on *California* v. *Green,* (1970) 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489. It is true that *Green* contains such language as this:

"Viewed historically . . . there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declar-

ant is testifying as a witness and subject to full and effective cross-examination. . . .

"[W]here the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem." 399 U.S. at 158, 162, 90 S.Ct. at 1935, 1937, quoted in *Nelson* v. *O'Neil,* (1971) 402 U.S. 622, 626-27, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222, and *Ortiz* v. *State,* (1976) 265 Ind. 549, 356 N.E.2d 1188, 1194.

I cannot believe, however, that the Supreme Court intended to relieve the State of the obligation to make any attempt to prove its case through the testimony of sworn witnesses given in open court where the trier of fact can observe their demeanor and where cross-examination takes place more or less contemporaneously with the testimony's reception. In *Green* the witness whose out-of-court statement was used was questioned about the facts of the offense but professed a lack of memory as to those facts due to drugs he had taken. The Court was therefore required to choose between permitting substantive evidentiary use of his prior statements and the total loss of relevant and necessary evidence. The danger of losing such evidence, in the *Green* Court's view, warranted admission of the statements despite diminished confrontation protection.

No one seriously asserts that cross-examination as to extrajudicial statements is the full equivalent of cross-examination of testimony given at trial; the most that is attributed to such substitute confrontation is that it is to be preferred to the loss of the evidence contained in the extrajudicial utterance.

"The most essential difficulty with the claim that cross-examination is 'by hypothesis' not requisite when the prior contradictory declarer is physically present is this. It denigrates the real office of cross-examination. Cross-examination postulates a witness who avows a thing under interrogation by a lawyer who would have him deny it, or a witness who denies a thing under inquisition by lawyer who would have him affirm it. Cross-examination is thus essentially adversary. Cooperation is the antonym of cross-

examination. The measure of the cross-interrogator's success is the extent to which he is able to destroy the witness's testimony in chief, shake the witness, elicit retractions, destroy his credibility. If the witness declines to adopt his former statement as true, no adversary cross-examination about it is possible." Beaver & Biggs, *Attending Witnesses' Prior Declarations as Evidence: Theory* vs. *Reality*, 3 Ind. L. Forum 309, 317-18 (1970) (Footnote omitted) ; See also Falknor, *The Hearsay Rule and Its Exceptions*, 2 U.C.L.A. L. Rev. 43, 53 (1954).

As the Minnesota Supreme Court noted:

"The chief merit of cross-examination is not that at some future time it gives the party opponent the right to dissect adverse testimony. Its principal virtue is the immediate application of the testing process. Its strokes fall while the iron is hot." *State* v. *Saporen*, (1939) 205 Minn. 358, 362, 285 N.W. 898, 901.

The Michigan Supreme Court has said of cross-examination as to extrajudicial statements:

"The would-be cross-examiner is not only denied the right to be the declarant's adversary, he is left with no choice but to become the witness' friend, protector and savior. Though he may be permitted to ask questions in the form of cross-examination, the substance of his effort will be redirect examination and rehabilitation. The reason is simple. The witness cannot recant. Every cross-examiner tries to bring the witness to the point where he changes his story— literally eats his words—in the presence of the jury. . . . No matter how deadly the thrust of the cross-examiner, the ghost of the prior statement stands. His questions will always sound like attempts to permit the witness to explain *why* he has changed his story before coming to court, with the jury being left to infer that he might have been induced to change his story in the intervening months or years, for some unrevealed and sinister reason." *Ruhala* v. *Roby*, (1967) 379 Mich. 102, 125, 150 N.W.2d 146, 156.

Where no effort to elicit testimony from the witness concerning the facts in issue is made at trial, no such compelling reason exists for dispensing with the safeguards our legal system provides for assuring the trustworthiness of evidence:

the oath, observation of the witness' demeanor, and contemporaneous cross-examination. Permitting such evidence will cause criminal trials in this state to resemble trials in the English perogative courts, whose reliance on *ex parte* affidavits to convict accused persons was a principal evil sought to be remedied by the constitutional guarantee of confrontation of one's accusers. See *California* v. *Green, supra*, 399 U.S. at 156-157 nn. 10-11, 90 S.Ct. 1934.

Note.—Reported at 368 N.E.2d 239.